# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Matthew F. Kennelly | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 1754 | **DATE** | 9/10/2002 |
| **CASE TITLE** | Flexicorps, Inc. vs. Trend Technologies | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]   For the reasons set forth on the attached order, Trend and Cam Fran Tool's motion for summary judgment (64-1) is granted as to Count 1 but denied as to Count 2. Remedy's motion for summary judgment (61-1) is granted.  The case remains set for trial on 1/6/03, and is set for status hearing on 9/24/02 at 9:30 a.m. to discuss the possibility of settlement.

(11) ■   [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | **Document Number** |
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | SEP 11 2002 | |
| ✓ | Docketing to mail notices. | | date docketed | 85 |
| | Mail AO 450 form. | | | |
| | Copy to judge/magistrate judge. | | docketing deputy initials | |
| OR | courtroom deputy's initials | | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

SEP 1 1 2002

| | | |
|---|---|---|
| FLEXICORPS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 01 C 1754 |
| | ) | |
| TREND TECHNOLOGIES, INC., | ) | |
| CAM FRAN TOOL, INC. and | ) | SEP 1 1 2002 |
| REMEDY TEMP, INC. d/b/a REMEDY | ) | |
| INTELLIGENT STAFFING, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Defendants Trend Technologies, Inc. ("Trend"), Cam Fran Tool, Inc. ("Cam Fran Tool")
and Remedy Temp, Inc. d/b/a Remedy Intelligent Staffing ("Remedy") seek summary judgment
on all of the claims in plaintiff Flexicorps, Inc.'s nine-count amended complaint. For the reasons
set forth below, Trend/Cam Fran Tool's motion is granted in part and denied in part, and
Remedy's motion is granted.

### FACTUAL BACKGROUND

Flexicorps is a temporary services provider. Its owner, Jeff Kubas, founded the company
in 1992, at which time it started supplying workers to Cam Fran Tool in Elk Grove Village,
Illinois. Kubas' brother-in-law, Mark Knudson, was CEO of Cam Fran Tool, and he entered into
an oral agreement with Kubas to utilize Flexicorps for the company's temporary employment
needs. In January 1993, Knudson offered Kubas a position with Cam Fran Tool so that Kubas

was working for the company both as an employee and as a vendor. According to Kubas, he and Knudson orally agreed at that time that if Cam Fran Tool ever decided to terminate Flexicorps' services, Kubas would receive 30 to 60 days notice. At the end of the notification period, Kubas says, the transition of Flexicorps personnel "would be made by attrition, new orders for additional staffing, and the addition of 2 or 3 new people per day for training purposes." Pl. Facts ¶¶7-9. Defendants claim that the alleged agreement was to give Kubas 30 to 60 days notice prior to terminating his services as an individual employee, and they argue that such an agreement would be unenforceable in any event due to the Statute of Frauds.

On December 15, 1997, Cam Fran Tool was purchased by Trend. Knudson served as Trend's vice president from that date until he retired in May 2000. Kubas left his job as account manager around the same time. In July 2000, Trend brought in Chuck Beck to run the plant. In an effort to find ways to improve the company's performance, Beck looked at the business and decided that he wanted (1) to have a flexible workforce that could be cross-trained in many different functions; (2) to improve safety at the plant; and (3) to have workers who could understand and communicate in English. Pl. Resp. to Trend Facts ¶¶16, 18. At that time, half of Trend's workforce consisted of temporary workers supplied by Flexicorps. To ensure that the company was using the best and most competitive temporary services provider, Trend requested service proposals from temporary agencies.

Remedy, a personnel staffing company with offices located throughout the United States, responded to Trend's request. Remedy was already supplying workers at Trend's California plant, and one of Remedy's California representatives told her colleague Susan Cooksey that Trend was considering a change in personnel vendors for the Elk Grove facility. Cooksey

2

contacted Beck, and on August 4, 2000, she and Joanne Wisdom, manager of Remedy's Carol Stream office, made a Power Point presentation to Beck and human resources assistant, Stacy Rome. The Trend representatives indicated that they wanted to hire more full-time employees and rely less upon temporary staffing. The attendees also discussed language skills, worker documentation and screening, and transitioning from one vendor to another. Beck advised Remedy that he did not want to continue using the current service, and Remedy suggested that if Trend decided to use Remedy's services, it should give notice to Flexicorps and require workers to apply with Remedy if they wanted to continue working at Trend.

On August 10, 2000, Flexicorps submitted a bid to Trend offering a rate of $7.60 per hour for unskilled labor. In late August 2000, the Flexicorps workers started complaining about pay differentials between departments at Trend. Defendants claim that the workers "staged a job action shutting down the plant," but Flexicorps disputes this characterization. In any event, it is undisputed that Kubas was called to the plant to address the situation and that, as a result, employees were promised a modest pay raise and medical and dental benefits. Remedy Facts ¶¶49-52; Pl. Resp. to Remedy Facts ¶¶49-52. Soon thereafter, in or about November 2000, Trend began using temporary workers supplied by both Flexicorps and Remedy. At that time, Remedy started filling positions based on attrition and business needs. Pl. Facts ¶65. Trend told Flexicorps that this was a trial arrangement, but Flexicorps claims that Remedy always intended to become Trend's sole temporary services provider.

By December 7, 2000, Trend had apparently identified Remedy as its primary vendor for labor services, as noted in a memo sent to Beck by the head of Trend's human resources department, Barry Rosenthal. DX 10. In that memo, Rosenthal expressed concern about

Remedy's services and workers and advised that Remedy was sending over workers who could not speak English and who were not authorized to work in the United States. According to Rosenthal, Remedy was "not providing enough good long-term people for us, nor are they screening to the degree they commitment [sic] to. . . I believe very strongly one agency will not be able to get us the headcount we need to remove all are [sic] illegals from this facility." DX 10. Also on December 7, 2000, Cooksey sent an e-mail to Marsha Egbert, a representative from Trend's California plant, stating that Remedy "recommended that the current temporary work force via Flexicorps be transitioned to Remedy," which "would provide Remedy with the revenue flow that would support the investments we are making in the account." Cooksey also acknowledged that Rosenthal had expressed concerns about the legality of Remedy's workers and stated that Remedy would begin running social security checks on all candidates. DX 21.

On December 18, 2000, Flexicorps submitted to Trend a second proposal for temporary employment services "based on information with the computer system to enhance Flexicorps' reporting capabilities to take over in-house billing which would help Flexicorps provide more support staff to Trend." Pl. Resp. to Trend Facts ¶34. The new bid was based on a 24 percent markup over an agreed-upon hourly rate, and was designed, at least in part, to address Trend's new language requirement, which Kubas learned about sometime after submitting the initial bid in August. Flexicorps' December 18 proposal was not accepted; instead, Beck decided to use Remedy's services exclusively. According to defendants, Beck chose Remedy because it was "a large organization, a higher level of operation in comparison to Flexicorps, national experience, safety training, recruitment and retention plan, quality orientation, application process,

preapplication, drug screening, interviewing process; – the 'whole package,' including a known success with another one of Trend's facilities." Trend Facts ¶37.

On January 24, 2001, Joanne Wisdom sent Rome an e-mail stating that after an announcement was made regarding the termination of Flexicorps' services, Remedy would not approach Flexicorps employees but that "they will need to see us if they have questions or want to continue at Trend." DX 33. On January 25, 2001, Beck met with Wisdom, Rome and two other Trend employees and decided to postpone the February 5, 2001 target date for transitioning the temporary labor work to Remedy, apparently because Remedy did not have enough employees to take over the work. Sometime between January 25 and February 2, 2001, however, Beck decided to go forward with the transition as planned. Beck claims that he made the decision to terminate Flexicorps because 20 to 30 percent of the Remedy and Flexicorps workers were not speaking to each other, which was disrupting production. (Beck Dep., p. 135). Flexicorps asserts that its workers were upset because "Remedy workers did not do work as well and because Flexicorps workers would train them and then be replaced by them." Pl. Facts ¶91.

By letter dated February 5, 2001, Trend notified Kubas that Flexicorps was being replaced by Remedy effective February 12, 2001. The termination letter indicated that Remedy had been chosen in order to reduce costs and increase efficiency. Pl. Resp. to Trend Facts ¶37. Also on February 5, Flexicorps' workers gathered in Trend's cafeteria to find out which vendor had been selected by Trend. Beck announced that Remedy would be the new vendor and that if the workers wanted to continue working at Trend, they would have to become employees of Remedy. Beck's announcement was translated into Spanish by a Trend employee and by Jose Castro, a recruiter for Flexicorps. Following the announcement, Beck and Kubas both urged the

Flexicorps workers to return to work or, if they would not, to leave the premises. Defendants claim that the vast majority of Flexicorps' workers walked off the job at that point and, over the next few days, applied to work for Remedy. Flexicorps maintains that Remedy recruited its workers as they were walking out on February 5, and "hired 182 of Flexicorps' workers between February 5 and February 12, 2001, before Flexicorps was even terminated." Pl. Resp. to Trend Facts ¶46. Flexicorps also claims that Beck told the workers that "he didn't want Flexicorps people anymore because they were Latino, no papers and no English." Pl. Facts ¶97. Following the announcement, workers who stayed on the job and did not quit were paid for the seven day notice period. Trend initially incurred an additional $100,000 per week in costs, not including overtime, as a result of using Remedy's services. Pl. Facts ¶124. At the time of Flexicorps' termination, all of its workers were Hispanic, and Trend accounted for close to 90 percent of Flexicorps' income. Pl. Facts ¶85.

On March 6, 2001, Flexicorps filed suit seeking to enjoin Remedy from further recruiting, soliciting or dealing with any Flexicorps employees. As a result, all remaining Flexicorps workers were discharged. On July 26, 2001, Flexicorps filed an amended complaint alleging that Trend breached its contract for temporary employment services (Count 1) and terminated Flexicorps' services in violation of 42 U.S.C. §1981 (Count 2), and that Remedy violated and conspired to violate 42 U.S.C. §1981 (Count 3), tortiously interfered with Flexicorps' business expectancy with its employees (Count 4), tortiously interfered with Flexicorps' contract with its employees (Count 5), tortiously interfered with Flexicorps' business expectancy with Trend (Count 6), tortiously interfered with Flexicorps' contract with Trend (Count 7), was unjustly

enriched by stealing Flexicorps' employees (Count 8), and violated the Illinois Trade Secrets Act ("ITSA"), 765 ILCS 1065/1 *et seq.*, by stealing Flexicorps' employees (Count 9).

## DISCUSSION

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether a genuine issue of material fact exists, a court must construe all facts and draw all reasonable and justifiable inferences in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

### A.    Breach of Contract Against Trend/Cam Fran Tool (Count 1)

In Count 1 of the amended complaint, Flexicorps claims that Trend and Cam Fran Tool (referred to collectively as "Trend" where appropriate) breached an oral contract to provide 30 to 60 days notice prior to terminating Flexicorps' services. Kubas and his brother-in-law Knudson allegedly made this agreement in or about January 1993 at the time when Knudson offered Kubas a personal job with Cam Fran Tool. Trend argues that Kubas and Knudson had already made an oral agreement for Flexicorps to supply temporary workers to Cam Fran Tool in 1992 and that there was no consideration for Knudson's purported new agreement in January 1993 to provide 30 to 60 days notice. Flexicorps asserts that "[t]he consideration for the termination agreement was for Flexicorps continuing to locate, recruit, and train additional workers for Cam Fran/Trend." Pl. Mem., p. 8.

Under Illinois law, a modification to an existing contract requires consideration to be legally enforceable. *Doyle v. Holy Cross Hospital*, 186 Ill. 2d 104, 112, 708 N.E.2d 1140, 1145

(1999). "[W]here a party does what it is already legally obligated to do, there is no consideration as there is no detriment." *White v. Village of Homewood*, 256 Ill. App. 3d 354, 357, 628 N.E.2d 616, 618 (1993). Flexicorps had already agreed to supply workers for Cam Fran Tool at the time Knudson allegedly agreed to provide notice prior to termination. Trend Facts ¶3. Flexicorps received an additional benefit – i.e., notice – but did not promise to do anything new in return.[1] Indeed, there is no evidence that Flexicorps gave up its right to terminate its services at any time without notice, or that it newly agreed to work exclusively for Cam Fran Tool. Nor is there evidence that Knudson and Kubas rescinded their original contract and replaced it with an entirely new one. *See, e.g., Contempo Design, Inc. v. Chicago and Northeast Illinois District Counsel of Carpenters*, 226 F.3d 535, 550 (7th Cir. 2000). Trend cannot be liable for breaching an unenforceable oral agreement to provide notice.

Flexicorps argues that even if the January 1993 agreement between Kubas and Knudson is unenforceable, the agreement nonetheless incorporates industry custom to provide at least thirty days notice prior to termination. Pl. Mem., p. 7. "If a usage exists in a particular trade of which both parties either had notice or should have had notice, it is only just and proper that their contract should be interpreted in view of the trade practice." *Merchants Environmental Industries, Inc. v. SLT Realty Limited Partnership*, 314 Ill. App. 3d 848, 863, 731 N.E.2d 394, 405 (2000). Industry custom may be relied upon to interpret an agreement only if the practice

---

[1]     The conversation between Kubas and Knudson regarding notice occurred in the context of a discussion of a personal job offer for Kubas. Interestingly, Kubas' own testimony indicates that Knudson agreed to provide notice prior to terminating Kubas, not Flexicorps: "We talked about if they were to terminate me, that they would let me know, give me at least 30 to 60 days notice. And that – well, he did not want me to grow Flexicorps so large on the outside that I would leave Cam Fran employment to go back and run Flexicorps." Kubas Dep., p. 98.

was "so well known, uniform, long-established and generally acquiesced in as to induce the belief that the parties contracted with reference to it." *Gray v. Mundelein College*, 296 Ill. App. 3d 795, 805, 695 N.E.2d 1379, 1386 (1998).

Flexicorps cites the affidavit of attorney A. Bernard Frechtman as evidence that "seven (7) day notice to Flexicorps and its employees is not reasonable or justified or in compliance with the ASA [American Staffing Association] guidelines." Frechtman Aff. ¶8. But Frechtman does not indicate how much notice *is* considered reasonable pursuant to industry custom, much less that the standard amount of time is 30 days. Nor is there credible evidence that either Knudson or Kubas knew or should have known about any such alleged custom at the time they entered into their oral agreement in August 1992. To the contrary, Kubas had no prior experience in the temporary staffing business prior to that date; he had worked as a police officer and an operations manager for two janitorial firms. Remedy Facts ¶¶4, 5. And Flexicorps presents no evidence that Knudson was aware in 1992 of an alleged industry custom with respect to terminating the services of a temporary employment agency. On these facts, the Court cannot say that the agreement between Flexicorps and Cam Fran Tool incorporated any alleged industry custom to provide thirty days notice of a termination. Accordingly, the Court grants summary judgment in favor of Trend/Cam Fran Tool on Count 1 of the complaint.[2]

## B.    Violation of §1981 (Counts 2 and 3)

To state a §1981 claim, Flexicorps must prove that (1) it is a member of a racial or ethnic minority; (2) defendants intended to discriminate against it on the basis of race or ethnicity; and

---

[2]    In light of this conclusion, the Court need not address Trend's argument that Flexicorps cannot seek to enforce a contract because it knowingly hired illegal aliens unauthorized to work in the United States. Trend Mem., pp. 9-10.

(3) the discrimination concerned "the making or enforcing of a contract," as defined in the statute. *Morris v. Office Max, Inc.*, 89 F.3d 411, 413 (7th Cir. 1996). Defendants argue that Flexicorps cannot establish that it is a member of a racial or ethnic minority because its owner, Kubas, is white. The Court has already determined that a corporation may have an ethnic identity based on having a workforce overwhelmingly made up of a single group. *See Flexicorps, Inc. v. Trend Technologies, Inc. et al.*, No. 01 C 1754, Order of 12/5/01. Flexicorps may not qualify as a "minority owned business" under Illinois law, 30 ILCS 575/2, but with a workforce that is almost entirely Latino, we believe Flexicorps could be the subject of intentional discrimination under §1981. Defendants have not cited any authority suggesting that only minority owned businesses can have an ethnic identity for purposes of §1981 and, thus, summary judgment is not appropriate on this basis.

### a. The §1981 Claim Against Trend

Flexicorps argues that Trend violated §1981 by terminating Flexicorps' agreement to provide temporary employment services because it did not want Hispanic workers who spoke Spanish. Trend maintains that Beck made a legitimate business decision to use Remedy's services based on its "national experience, safety training, recruitment and retention plan, quality orientation, application process, preapplication, drug screening, interviewing process; – the 'whole package,' including a known success with another one of Trend's facilities." Trend Reply, p. 5. Flexicorps has presented at least some evidence suggesting that this reason is a pretext, which precludes summary judgment on Count 2 of the complaint.

When Beck became the manager of Trend's Elk Grove facility, he put the temporary vendor contract out to bid in order to determine whether it was competitive. Beck also was

10

concerned about having an undocumented workforce and wanted all Trend employees to be able to communicate in English. It is not entirely clear why Beck implemented an English language requirement.[3] Indeed, Flexicorps had supplied non-English-speaking workers to Trend for over two years and to its predecessor Cam Fran Tool for over five years without any apparent problem; none of the job descriptions mentioned a need to speak English; and at least some of the machines had instructions in both English and Spanish. Beck Dep., pp. 69-70. The policy is not discriminatory in and of itself because there is no evidence that employees were required to speak exclusively English in the workplace. *Compare Equal Employment Opportunity Commission v. Synchro-Start Products, Inc.*, 29 F. Supp. 2d 911, 914-15 (N.D. Ill. 1999) (noting that English-only rules in the workplace may create an inference of discrimination absent a showing of business justification). Nevertheless, there is at least a question as to whether Beck's decision to implement such a policy was motivated by discriminatory animus. Beck knew that the English language requirement was screening out a large segment of the Hispanic community. DX 32; Beck Dep., pp. 177-79. In addition, Flexicorps has presented evidence that on February 5, 2001, Beck told Flexicorps' workers that he did not want to use them anymore because they were Latino and did not speak English.[4]

---

[3] Trend notes that on January 7, 2000, a Spanish-speaking employee died when the lift truck he was operating fell off the dock. Carlos Garcia, a bilingual employee, reportedly "had relayed instructions in English from Dennis Bergraf to Antonio Rodriguez in Spanish." Trend Facts ¶15. The implication is that the inability to communicate in English caused an employee's death. Significantly, however, Beck never stated that the English language policy was in any way related to this incident.

[4] Interestingly, Kubas was present for the meeting between Beck and the Flexicorps workers but did not personally hear any discriminatory statements by Beck. Kubas Dep., pp. 200-20.

Flexicorps has also raised genuine issues of fact regarding Trend's stated explanation for terminating Flexicorps' services. *See Von Zuckerstein v. Argonne National Laboratory*, 984 F.2d 1467, 1472 (7th Cir. 1993); *Blakely v. Brach & Brock Confections, Inc.*, 181 F. Supp. 2d 943, 945-46 (N.D. Ill. 2002) (a plaintiff bringing suit under §1981 "can meet his burden of proof for establishing intentional discrimination either through direct proof of discriminatory intent, or through the indirect, burden-shifting method of proof first elaborated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L.Ed.2d 668 (1973)"). Trend began using Remedy to supply temporary labor in or about November 2000. By December 7, 2000, Trend considered Remedy to be its "primary vendor for labor services" based upon Remedy's national experience, safety training, recruitment and retention plan, quality orientation, application process, preapplication, drug screening, and interviewing process. However, the head of Trend's human resources department found that Remedy was bringing in workers who were not authorized to work in the United States, failed drug tests, did not speak English and had high turnover rates – the same concerns Beck allegedly had about Flexicorps' workers. DX 10. Only as a result of Trend's complaints did Remedy start checking workers' social security numbers as a matter of course. Otherwise, Remedy and Flexicorps apparently utilized the same employee screening techniques.

Moreover, despite Beck's claimed concerns about the documentation and language skills of the Flexicorps workers, Remedy hired 182 of those workers between February 5 and 12, 2001 for placement with Trend. According to Flexicorps, Remedy intended to fire those workers once it found non-Hispanic replacements meeting Trend's requirements. Wisdom Dep. 2, p. 137. Defendants suggest that some Flexicorps workers were discharged for lack of documentation,

and others as a result of Flexicorps' lawsuit. Remedy Facts ¶¶99, 100. Either way, a reasonable jury could conclude that Beck's stated concerns about Flexicorps' workers were a pretext for national origin discrimination. The fact that as of May 23, 2001, Trend had hired approximately 30 employees with Hispanic surnames does not alter this conclusion. *Id.* ¶103-04. The employees were hired after Flexicorps filed its lawsuit and could be viewed by a jury as a cover for Trend's earlier discrimination.

Trend argues that it is entitled to summary judgment because Flexicorps hired undocumented workers who could have been discharged in any event for that reason. Trend Mem., pp. 12-13. The Court disagrees. Two Flexicorps managers testified that they hired individuals who were not authorized to work in the United States. One of the managers claims that she did not know the workers were ineligible to work at the time she hired them. Christiansen Aff. ¶¶5-11. The other manager admits to knowingly hiring some undocumented workers on one occasion for a two-week period before Beck became plant manager. Garcia Aff. ¶¶9-17. Flexicorps maintained I-9 immigration forms for all of its workers, and there is no evidence that any significant portion of Flexicorps' workforce would have been subject to discharge pursuant to the Immigration Reform and Control Act. At most Trend has raised a question of fact as to whether Flexicorps knowingly hired unauthorized workers; it has not shown that it is entitled to summary judgment on this basis.

**b.     The §1981 Claim Against Remedy**

Flexicorps also argues, somewhat inartfully, that Remedy violated §1981 by "tempnapping" its employees and interfering in its relationship with Trend. Section 1981 "proscribes not only discrimination by the contracting party . . . but also discriminatory

interference by a third party with the exercise of the right to make [and enforce] contracts."
*Lewis-Kearns v. Mayflower Transit, Inc.*, 932 F. Supp. 1061, 1070 (N.D. Ill. 1996) (quoting
*Vakharia v. Swedish Covenant Hospital*, 765 F. Supp. 461, 471 (N.D. Ill. 1991)). Unfortunately
for Flexicorps, it has no evidence that Remedy's motive to take over the Trend business was
based on discriminatory animus against Flexicorps' Hispanic workers. *See, e.g., Butt v. Board of
Trustees of Eastern Illinois University*, 83 F. Supp. 2d 962, 969 (C.D. Ill. 1999) (§1981 claim
requires proof of "purposeful discrimination").

Nor is there any evidence that Remedy conspired with Trend to eliminate Hispanic
workers. To succeed on such a claim, Flexicorps must prove: (1) a conspiracy; (2) for the
purpose of depriving, either directly or indirectly, any person or class of persons of equal
protection of the laws; (3) an act in furtherance of the conspiracy; and (4) injury. *Quinones v.
Szorc*, 771 F.2d 289, 291 n.1 (7th Cir. 1985). *See also Copeland v. Northwestern Memorial
Hospital*, 964 F. Supp. 1225, 1234-35 (N.D. Ill. 1997). Flexicorps has not established that
Remedy agreed to oust Flexicorps from Trend because of Flexicorps' Hispanic identity, or that
anyone at Trend even told Remedy that it was trying to rid its workforce of Hispanic employees.
To the contrary, between November 20, 2000 and February 1, 2001, Remedy hired 45 individuals
with Hispanic surnames, constituting 20 percent of Remedy's hires during that time. Pl. Resp. to
Remedy Facts ¶¶112, 114. At best, Flexicorps has shown that Remedy wanted the Trend
contract and tried to supply workers meeting Trend's qualifications. Absent some evidence that
Remedy intentionally interfered with Flexicorps' enjoyment of its contract with Trend or
conspired to terminate Flexicorps' contract because of Flexicorps' Hispanic identity, Flexicorps

cannot sustain a claim against Remedy under §1981. Summary judgment is granted on Count 3 of the complaint.

## C.   Tortious Interference with Business Expectancy Against Remedy (Counts 4 and 6)

To establish a claim for tortious interference with business expectancy, Flexicorps must prove: (1) a reasonable expectancy of entering into a valid business relationship; (2) Remedy's knowledge of the expectancy; (3) an intentional and unjustified interference by Remedy that induced or caused a breach or termination of the expectancy; and (4) damage to Flexicorps resulting from Remedy's interference. *Voyles v. Sandia Mortgage Corp.*, 196 Ill. 2d 288, 300-01, 751 N.E.2d 1126, 1133-34 (2001). Flexicorps claims that Remedy tortiously interfered with its business expectancy with the Flexicorps employees and with Trend. The Court addresses each claim in turn.

### 1.   Interference with Flexicorps Employees

Flexicorps argues that Remedy wrongfully advised Trend to provide only seven days notice prior to terminating Flexicorps' services and that, as a result, Flexicorps' workers had no choice but to apply for a job with Remedy if they wanted to remain employed at Trend. Pl. Mem., p. 12. Of course, once Trend decided to hire Remedy, Flexicorps employees wanting to remain at Trend had no choice but to apply for a job with Remedy regardless of the amount of notice they received. In any event, Remedy argues that as Flexicorps' competitor, it was privileged to interfere with Flexicorps' relationship with its employees. Generally, a company may try to take another company's employees if it can do so without inducing a breach of contract. "That is the process known as competition, which though painful, fierce, frequently ruthless, sometimes Darwinian in its pitilessness, is the cornerstone of our highly successful

economic system." *Speakers of Sport, Inc. v. ProServ, Inc.*, 178 F.3d 862, 865 (7th Cir. 1999).

Competition "privilege[s] inducing the lawful termination of a contract that is terminable at

will." *Id.* (citing *Galinski v. Kessler*, 134 Ill. App. 3d 602, 480 N.E.2d 1176, 1182-83 (1985)).

*See also Ancraft Products Co. v. Universal Oil Products Co.*, 84 Ill. App. 3d 836, 844-45, 405

N.E.2d 1162, 1168-69 (1980) ("[i]n the absence of an express contract of employment and

without malice, principles of free competition prevent liability to a subsequent employer" that

entices employees away from a competitor); *Hi-Tek Consulting Services, Inc. v. Bar-Nahum*, 218

Ill. App. 3d 836, 841-42, 578 N.E.2d 993, 997 (1991) (same); *Europlast, Ltd. v. Oak Switch

Systems, Inc.*, 10 F.3d 1266, 1274 (7th Cir. 1993) (a competitor is allowed "to woo an at-will

employee away from his employer").

     Flexicorps and Remedy are clearly competitors in that they both provide temporary labor

services and both sought to work with Trend. Flexicorps claims that Remedy took Flexicorps'

workforce to avoid making the necessary investment to find its own employees. Yet Flexicorps

also argues that Remedy actually intended to recruit its own employees and only hired

Flexicorps' workers until it could find employees meeting Trend's requirements. Flexicorps

relies on the American Staffing Association ("ASA") Code of Ethics to establish that the

temporary employees of an outgoing company should be totally replaced at the time of transition

or replaced by attrition to avoid a stampede to the new vendor. Pl. Mem., p. 11; Frechtman Aff.

¶¶3, 4. However, the ASA guidelines state only that the outgoing vendor and its employees

should receive "reasonable prior notice" "whenever feasible," and Flexicorps' expert does not

indicate how much notice would have been reasonable in this case – he merely opines that seven

days was not reasonable. Moreover, Kubas himself testified that he disagrees with the ASA guidelines. Kubas Dep., pp. 353-55.

At the time of the termination, Trend constituted over 90 percent of Flexicorps' income, and it is highly doubtful that Flexicorps could have placed its employees with a new company even with a full 30 days notice. In fact, most of Flexicorps' workers walked off the job after learning that Remedy would be the new vendor and refused to work even one more week. Moreover, Flexicorps knew that Trend had solicited bids for temporary labor services and that as of November 2000 it was losing at least half of Trend's business to Remedy, yet there is no evidence that Flexicorps attempted to secure any new clients who could hire its employees. Flexicorps has provided evidence that (1) Remedy told Trend that it only needed to provide seven days notice prior to terminating Flexicorps' services; (2) Remedy did not have enough workers to fill the positions at Trend; and (3) Remedy needed Flexicorps' workforce, if only temporarily. In addition, in an e-mail dated December 7, 2000, Cooksey affirmatively acknowledged Remedy's plan to take over Flexicorps' workforce so that Remedy would have sufficient revenue flow. DX 21. However, these facts do not evidence wrongdoing by Remedy sufficient to defeat its privilege to compete with Flexicorps. Summary judgment is granted on Count 4 of the complaint.

**2.    Interference with Trend Contract**

Flexicorps argues that Remedy tortiously interfered with its relationship with Trend by "agree[ing] to provide English-speaking workers only and assist[ing] in eliminating a 100 percent Hispanic/Latino work force." Pl. Mem., p. 12. As noted, a company generally may try to take another company's clients if it can be accomplished without inducing a breach of contract.

17

*Speakers of Sport*, 178 F.3d at 865. This Court has already concluded that Flexicorps' contract with Trend was terminable at will, so the competitor's privilege applies.

Flexicorps has not presented any evidence that Remedy employed wrongful means to obtain the Trend business. Remedy learned that Trend was accepting bids for the Elk Grove facility because it was already supplying workers to Trend's California plant, and it gave a presentation to Trend representatives in response to that bid request. Trend decided that it wanted to use Remedy's services and Remedy accepted the work. Contrary to Flexicorps' assertion, there is no evidence that Remedy agreed to provide workers who spoke exclusively English; rather, it agreed to provide workers able to communicate in English as requested by its client, Trend. Nor is there evidence that Remedy conspired with Trend to eliminate Flexicorps because of its alleged Hispanic identity. Remedy was privileged to compete with Flexicorps to take over the Trend business and, thus, summary judgment is granted on Count 6 of the complaint.

## D.      Tortious Interference with Contract Against Remedy (Counts 5 and 7)

To succeed on its claims for tortious interference with contract, Flexicorps must prove: (1) the existence of a valid and enforceable contract between Flexicorps and another; (2) Remedy's awareness of the contract; (3) Remedy's intentional and unjustified inducement of a breach of the contract; (4) a subsequent breach caused by Remedy's wrongful conduct; and (5) damages. *HPI Health Care Services, Inc. v. Mt. Vernon Hospital, Inc.*, 131 Ill.2d 145, 154-55, 545 N.E.2d 672, 675 (1989). Flexicorps argues that Remedy tortiously interfered with its contract with the Flexicorps employees and with its contract with Trend. The Court addresses each in turn.

18

### 1. Interference with Flexicorps Employees

Flexicorps argues that Remedy wrongfully induced Trend to provide only seven days notice to Flexicorps "in order to create a stampede of Flexicorps employees to Remedy who desired continued employment with Trend." Pl. Mem., p. 10. According to Flexicorps, Remedy did not have enough employees to perform Trend's work and "wanted to avoid the investment needed to recruit, locate, hire, and train its own workers, and to avoid a fee-sharing or subcontracting arrangement with Flexicorps." *Id.* Remedy asserts that Flexicorps' employees worked at will and that even though none of them worked for Trend or Remedy as of March 29, 2001, Flexicorps made no effort to contact them or to "provide them with the employment he [Kubas] now asserts it was wrongfully prevented from offering." Remedy Reply, pp. 11-12.

A company cannot tortiously induce an employee to terminate his employment contract, even when that contract is terminable at will. However, "[a]n action for tortious interference with a contract terminable at will is classified as one for intentional interference with prospective economic advantage." *Canel and Hale, Ltd. v. Tobin*, 304 Ill. App. 3d 906, 918, 710 N.E.2d 861, 871 (1999). Flexicorps has not raised genuine issues of fact with respect to its claim of tortious interference with prospective economic advantage and, for similar reasons, its claim for tortious interference with contract also fails as a matter of law. *See Speakers of Sport*, 178 F.3d at 865 (inducing the termination of a contract at will can be actionable as an interference with prospective economic advantage or with the contract at will itself; "[n]othing turns on the difference in characterization"). Thus, summary judgment is granted on Count 5 of the complaint.

## 2.     Interference with Trend Contract

It is not entirely clear what Flexicorps considers to be Trend's breach for purposes of the tortious interference with contract claim. In its memorandum, Flexicorps states that "[a]s to the contract between Trend and Flexicorps, the wrongful means used by Remedy was advising Chuck Beck that a seven-day notice was appropriate since mass conversion or 'transitioning' of Flexicorps' employees was customary." Pl. Mem., p. 8. To the extent that Flexicorps is arguing that Remedy induced Trend to breach its contractual obligation to provide 30 to 60 days notice prior to terminating Flexicorps' services, summary judgment is appropriate because Flexicorps did not have an enforceable contract for such notice, nor can the Court infer the requirement of notice from industry custom. *See* discussion at pp. 7-9 *supra*.

Flexicorps obviously believes that Trend had no basis for terminating its contract, but Trend was free to do so at any time. "One's interest in a contract terminable at will is primarily an interest in future relations between the parties . . . If the defendant was a competitor regarding the business involved in the contract, his interference with the contract may not be improper." Restatement (Second) of Torts §766, comment g. As explained earlier, Remedy was a competitor of Flexicorps and as such was privileged to interfere with Flexicorps' at-will relationship with Trend. There is no evidence that Remedy employed wrongful means to secure the Trend business, and Remedy's motion for summary judgment on Count 7 of the complaint is therefore granted.

## E.     Unjust Enrichment Against Remedy (Count 8)

To sustain a claim for unjust enrichment, Flexicorps must show that Remedy has (1) received a benefit; (2) to Flexicorps' detriment; and (3) Remedy's retention of that benefit would

20

be unjust. *TRW Title Insurance Co. v. Security Union Title Insurance Co.*, 153 F.3d 822, 828 (7th Cir. 1998) (citing *HPI Health Care Services*, 131 Ill. 2d at 160, 545 N.E.2d at 678-79). "The theory of unjust enrichment is based on a contract implied in law and, therefore, does not apply where there is a specific contract that governs the relationship of the parties." *Perez v. Citicorps Mortgage, Inc.*, 301 Ill. App. 3d 413, 425, 703 N.E.2d 518, 526 (1998). *See also AA Sales & Associates, Inc. v. JT & T Products Corp.*, 48 F. Supp. 2d 805, 807 (N.D. Ill. 1999). An unjust enrichment theory can also be based on a tort claim. *Peddinghaus v. Peddinghaus*, 295 Ill. App. 3d 943, 949, 692 N.E.2d 1221, 1225 (1998).

Flexicorps argues that Remedy was unjustly enriched by "the mass conversion of Flexicorps employees orchestrated through the use of a seven day notice of termination." Pl. Mem., p. 13. This Court has already found that Flexicorps has not raised genuine issues of fact on its claims for tortious interference with prospective economic advantage or with contract arising from Flexicorps' relationship with its employees. Accordingly, Flexicorps' claim of unjust enrichment, which is based on these tort theories, fails as a matter of law. Remedy's motion for summary judgment on Count 8 of the complaint is granted.

**F.    Violation of the ITSA (Count 9)**

To establish a violation of the ITSA, a plaintiff must demonstrate that information was (1) a trade secret (not generally known in the industry); (2) misappropriated or stolen (not developed independently or from another source); and (3) used in the defendant's business. *Delta Medical Systems v. Mid-America Medical Systems, Inc.*, 331 Ill. App. 3d 777, 772 N.E.2d 768, 780 (2002). The ITSA defines a "trade secret" as:

> information, including but not limited to technical or non-technical
> data, a formula, pattern, compilation, program, device, method,
> technique, drawing, process, financial data, or list of actual or
> potential customers or suppliers, that:
> (1) is sufficiently secret to derive economic value, actual or
> potential, from not being generally known to other persons who
> can obtain economic value from its disclosure or use; and
> (2) is the subject of efforts that are reasonable under the
> circumstances to maintain its secrecy or confidentiality.

765 ILCS 1065/2.

Flexicorps claims that Remedy violated the ITSA by hiring away Flexicorps' "carefully

screened inventory of temporary employees." Complaint ¶¶42-46. Remedy argues that the

employees are not in and of themselves trade secrets; rather, Flexicorps must identify some

special list or document pertaining to the employees which Remedy wrongfully obtained.

Remedy Mem., p. 15; Remedy Reply, p. 15. *See, e.g., RKI, Inc. v. Grimes*, 177 F. Supp. 2d 859,

873-74 (N.D. Ill. 2001) (customer lists may be trade secrets under appropriate circumstances).

The Court agrees with Remedy. "While a business can have a proprietary interest in lists of

customers which it maintains, no business can have a proprietary interest in the customers

themselves." *Murphy v. Murphy*, 28 Ill. App. 3d 475, 478, 328 N.E.2d 642, 644 (1975). *See

also Engineering Resources, Inc. v. CRS Steam, Inc.*, No. 94 C 6970, 1997 WL 232778, at *2

(N.D. Ill. May 1, 1997), *aff'd*, 142 F.3d 439 (7th Cir. 1998). By extension, Flexicorps did not

have a property interest in its individual employees, even though it spent considerable effort and

expense to recruit them. There is no allegation that Remedy used Flexicorps' confidential

recruiting process to entice the employees away from Flexicorps, or that the employees

themselves were privy to Flexicorps' trade secrets. Flexicorps' workforce is not a trade secret for

purposes of the ITSA and, thus, Remedy's motion for summary judgment on Count 9 is granted.

22

**CONCLUSION**

For the reasons stated above, Trend and Cam Fran Tool's motion for summary judgment [docket item 64-1] is granted as to Count 1 but denied as to Count 2. Remedy's motion for summary judgment [docket item 61-1] is granted. The case remains set for trial on January 6, 2003, and is set for a status hearing on September 24, 2002 at 9:30 a.m. to discuss the possibility of settlement.

_____
MATTHEW F. KENNELLY
United States District Judge

Date:    September 10, 2002